SPERRY & HUTCHINSON CO. v. BLUE, State Tax Com'r.

(Circuit Court of Appeals, Fourth Circuit. November 13, 1912.)

No. 1,094.

1. JUDGMENT (§ 828*)—JUDGMENTS OPERATIVE AS BAR—STATE AND FEDERAL COURTS.

A final judgment on the merits in the courts of a state is conclusive in the federal courts between the parties or their privies whether the question determined was one of federal, general, or local law.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1504–1509; Dec. Dig. § 828.*

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468.]

2. JUDGMENT (§ 572*)—JUDGMENTS OPERATIVE AS BAR—JUDGMENT ON DEMURRER.

A judgment sustaining a demurrer to a bill to enjoin enforcement of a state statute on the ground of its unconstitutionality is as conclusive as one rendered on proof, and is a bar to a subsequent suit to have the statute declared invalid upon any ground which might have been litigated in the prior suit.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1047–1049; Dec. Dig. § 572.*]

3. LICENSES (§ 7*)—TAX ON OCCUPATIONS—VALIDITY.

Where a license tax on an occupation or a business is imposed by one provision of an act comprising a complete tax code for a state, an intention to prohibit such particular business cannot properly be imputed to the Legislature because of the amount of the tax.

[Ed. Note.—For other cases, see Licenses, Cent. Dig. §§ 7–15, 19; Dec. Dig. § 7.*]

4. CONSTITUTIONAL LAW (§ 70*)—JUDICIAL POWER—VALIDITY OF STATUTES.

It is not within the province of the federal courts to declare an act of a state Legislature, passed in the exercise of its lawful taxing power, invalid on the ground that the power was in the particular case exercised for an unlawful purpose, so long as there is no discrimination against citizens of other states nor interference with interstate commerce.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129–130, 137; Dec. Dig. § 70.*]

Appeal from the District Court of the United States for the Southern District of West Virginia, at Charleston; J. C. Pritchard, Benj. F. Keller, and Alston G. Dayton, Judges.

Suit in equity by the Sperry & Hutchinson Company against Fred. O. Blue, Tax Commissioner of West Virginia. Decree for defendant, and complainant appeals. Affirmed.

John Hall Jones, of New York City (T. C. Townsend, of Charleston, W. Va., on the brief), for appellant.

William G. Conley, of Charleston, W. Va. (Fred. O. Blue, of Phillippi, W. Va., on the brief), for appellee.

Before GOFF, Circuit Judge, and BOYD and ROSE, District Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ROSE, District Judge. The complainant is a New Jersey corporation. It is engaged in the trading stamp business. It will be referred to as the Stamp Company. The respondent is the State Tax Commissioner of West Virginia. He will be called the Commissioner.

In the court below the Stamp Company sought to have the Commissioner enjoined from enforcing against it a state law imposing a license tax upon persons or corporations engaged in the trading stamp business. The amount of this tax is $500 for each county in which the business is carried on. In any case in which the state imposes an occupation tax, the city of Charleston is authorized by law to levy for municipal purposes a like amount on any one following such occupation within the corporate limits. Charleston has availed itself of this permission. In consequence state and city together exact of the Stamp Company $1,000 per annum for the privilege of carrying on business in that place.

In its bill of complaint the Stamp Company says that these exactions, though made in the guise of taxes, are not intended to raise revenue, but to prevent the carrying on of the trading stamp business. It alleges that such business is a legitimate one; that the Legislature cannot directly forbid it; that what the Legislature cannot do directly it may not accomplish by indirection. To the Stamp Company's bill the Commissioner demurred. The demurrer was argued before Circuit Judge Pritchard and District Judges Keller and Dayton. It was sustained. The Stamp Company elected to stand on the bill without seeking to amend it. It was thereupon dismissed. The appeal to this court followed.

The eleventh paragraph of the bill of complaint reads as follows:

"Complainant further alleges that the State Tax Commissioner of West Virginia on or about the 20th day of April, 1908, notified complainant that it would have to pay the state license tax of $500 for conducting its business in said county of Kanawha, and thereafter, by agreement with said State Tax Commissioner, complainant filed in the circuit court of Kanawha county a bill in equity praying that the sheriff of Kanawha county be restrained and enjoined from taking any action to enforce said state license tax for said county on the ground that said license tax law was unconstitutional. To this bill a demurrer was filed. The judge of said court sustained the demurrer, and complainant appealed to the Supreme Court of Appeals of West Virginia, which affirmed the decision."

The Commissioner says that this allegation shows that in a proceeding to which both the Stamp Company and himself were parties the issue here raised had been previously adjudged against it by a court of competent jurisdiction, whose judgment in the premises still stands unreversed and unmodified.

[1] The Stamp Company does not question that in contemplation of law the parties to this case and to that in the state court are identical. Its counsel, however, contended that the Constitution and the legislation of Congress recognize the possibility that state courts may not always hold the scales of justice even between a citizen of their own state and a citizen of another state. The Commissioner is a citizen of West Virginia. It is a corporation of an-

other state. It claims that it has a right to its day in the federal court. In its view it is immaterial that it has already had a day upon the same issue in the state court, and that in that court judgment has gone against it. It says that this court must hear its complaint no matter what the state court did with that complaint when previously made to it. That we may not do. The same contention here made was set up in the case of Mitchell v. First National Bank of Chicago, 180 U. S. 481, 21 Sup. Ct. 421, 45 L. Ed. 627. The Supreme Court there answered it by saying:

"It is said that the question here presented was one of general jurisprudence involving the rights of citizens of different states, and that the Circuit Court was not bound to accept the views of the state court, but was at liberty, indeed, under a duty, to follow its own independent judgment as to the legal rights of the parties. Burgess v. Seligman, 107 U. S. 20 [2 Sup. Ct. 10, 27 L. Ed. 359]. If it were true that the question was in whole or in part one of general law, the thing adjudged by the state court when properly brought to the attention of the Circuit Court would still be conclusive between the same parties or their privies. Whatever may be the nature of a question presented for judicial determination—whether depending on federal, general, or local law—if it be embraced by the issues made, its determination by a court having jurisdiction of the parties and of the subject-matter binds the parties and their privies so long as the judgment remains unmodified or unreversed."

[2] The Stamp Company says that the judgment in the state court is not binding here because it was upon a demurrer, and not after hearing upon the merits. "A judgment on demurrer is as conclusive as one rendered upon proof." Northern Pacific Ry. Co. v. Slaght, 205 U. S. 130, 27 Sup. Ct. 445, 51 L. Ed. 738. The bill of complaint in this case says that the bill in the state court expressly alleged that the act here attacked was unconstitutional. Whether the act was constitutional upon any state of facts which the Stamp Company could truthfully allege could be as accurately determined upon a demurrer to a well-drawn bill as at a hearing upon the proofs. That being the case, "the same legal consequences followed from" the judgment upon it. Northern Pacific Ry. Co. v. Slaght, supra.

In the argument at this bar the Stamp Company said that the demurrer was sustained in the state court because the bill therein did not show some of the facts set forth in the bill now before this court. Even so, "the general rule of the extent of the bar is not only what was pleaded or litigated, but what could have been pleaded or litigated." Northern Pacific Ry. Co. v. Slaght, supra. The Stamp Company in argument claims that it could not have pleaded in the state court many of the facts set forth in the bill in the case at bar because those facts were not then known to it. Moreover, it says that it could not then have had knowledge of them because they happened since the beginning of the proceedings in the state court. When it filed its bill in the state tribunal, it had been in business in West Virginia but a short while. It could not, it contends, then have alleged the relation borne by the tax to the profits realized from its business or realizable therefrom. In strictness it is unnecessary to consider whether, if such contention were well founded, the decree in the state court would

be a bar to the proceeding here. This case is being heard on demurrer. No such explanation of the insufficiency of the state court bill is made in that in this court. The record before us tells us nothing more than that in the state court the Stamp Company alleged that the act imposing the license tax was unconstitutional; that the bill was demurred to; that the court of first instance sustained the demurrer and dismissed the bill; and that the Supreme Court of the state affirmed its decree. No clearer instance of res adjudicata as to the constitutionality of the act could be easily stated than that which appears on the face of the bill in this case. The opinion of the Supreme Court of West Virginia will be found reported under the title of Sperry & Hutchinson Co. v. Melton, 69 W. Va. 124, 71 S. E. 19, 34 L. R. A. (N. S.) 433. It is said that it there appears that the action of the lower court in sustaining the demurrer to the bill was affirmed merely because that bill did not contain allegations found in the pending one. The record does not contain the pleading which the highest court of West Virginia said disclosed no sufficient ground for relief. It is therefore not before us. The Commissioner in an appendix to his brief has, however, reproduced it. If we are free to consider it at all, it appears that there are allegations found in it which are not in the bill in the present case. For the most part, however, whatever is charged in one and not in the other might have been stated in either.

The Supreme Court of Appeals understood the bill before it as alleging that the Stamp Company if it was required to pay the tax could not carry on its business in Charleston, Kanawha county, at a profit. What that bill said was that the Stamp Company's total receipts from its business in that county was or would be $7,500. If it paid the tax, its expenditures would be $7,665. With the bill in the pending case were filed certain exhibits. From them it appears that in a period of a little over three years the Stamp Company's receipts in Charleston aggregated $19,800.54, its expenditures $21,291.40. Of these expenditures $1,500 were on account of the tax now assailed, and an additional $1,000 on account of the municipal tax levied by an ordinance of the city of Charleston. These figures do not differ widely enough from those before the state court to justify us in assuming that had they been before that court its conclusion would have been different from that at which it in fact arrived. The figures in the exhibits when analyzed do not show that the tax is prohibitory. During the part of the calendar year 1908 in which it was carrying on business in Charleston, and during the whole year of 1909, its receipts footed up $8,064.-97. Its expenditures, exclusive of either the state or municipal license tax, were $8,913.64. That is to say, if it had paid no such tax, it would still have lost $848.67. In 1911 its receipts were $5,481.65. Its expenditures, other than those for license taxes, $3,881.95. That is to say, but for the tax it would have made a profit of $1,599.70. The state tax which is here assailed is $500 per year. The municipal tax is of a like amount. The Stamp Company could during the year 1911 have paid both these taxes, and still have cleared $599.70, which is about 10 per cent. of its gross receipts. So far as these figures show

anything, they strongly suggest that in the first months and years of the business in a particular locality money is lost. This is not a phenomenon peculiar to trading stamp companies. After the business has once been well established, it becomes profitable. Possibly it may become so profitable that it will be able to pay the license tax or taxes and still make money. In the bill before us it is alleged that the Stamp Company, in spite of the tax, had begun business in two additional places, viz., at Clarksburg and Grafton. Its stores in these towns were opened four and two months, respectively, before the filing of the bill in this case. In each instance the exhibits annexed to the bill show that the Stamp Company had lost money. Such statement does not aid us in reaching any conclusion as to whether the business was likely ultimately to prove profitable or not.

In short, none of the figures contained in the exhibits present the situation in any different aspect from that depicted by the state court bill. Indeed, they weaken, rather than strengthen, the contention there and here made that the Stamp Company will be unable to pay the tax. The allegations contained in this bill to the effect that the license taxes were not equal and uniform, but were discriminative, especially with regard to persons engaged in the advertising business and with regard to general merchants selling merchandise, and others, and were excessive, unreasonable, unjust, oppressive, and prohibitory, were distinctly made in the bill in the state court. The Supreme Court of Appeals, in the course of its opinion, said that the Stamp Company did not say that other persons might not be able to carry on the business at a profit. It merely alleged that it could not. In the present bill the Stamp Company says that other trading stamp concerns had tried to pay the tax and do business in West Virginia, and that they had, one and all, given it up as unprofitable. It asserts that none could succeed where it failed, and that it would be successful when many or most others would go to the wall. It explains that it feels justified in so stating because it has had a wider experience and has abler management and larger capital than any other person or corporation in the same business. These facts, if they be such, were all known to the Stamp Company when it filed its bill in the state court.

The final judgment on the demurrer, so long as it stands unreversed, forecloses here not only what was litigated in the other case, but what might have been. In the litigation in the state courts the Stamp Company had expressly charged that the license tax deprived it of rights secured to it by the Constitution of the United States. The highest court of West Virginia decided against this claim. The Stamp Company could, if it had seen fit, have taken the case to the Supreme Court of the United States. It did not do so. Instead, it went into a lower federal court, and asked that court, in effect, to reverse the judgment of the Supreme Court of Appeals of the state.

The reasons why a lower federal court should not do what the Circuit Court for the Southern District of West Virginia is asked to do in this case are so obvious that such action never should be taken if it can be avoided without denying to the parties before the court the rights to which they are clearly entitled. If the litigants in the federal

courts had been neither nominal nor actual parties to the state litigation, the federal court must, on questions involving the construction and application of the Constitution of the United States, exercise its own judgment. It will be compelled to do so even if the result of such exercise should unfortunately reveal that its views were not in accord with those previously expressed by the state tribunals. Different principles, however, apply where the parties, in the federal courts have first taken their grievances to the state tribunal, and have there litigated them. They have had their day in court, and in this case a day in a court of their own choosing. They must abide the outcome.

The court below could not for these reasons have granted any of the relief for which the Stamp Company asked even had it supposed that the Stamp Company would have been entitled to such relief had it not been for the adverse decision of the state court. If, however, that judgment were out of the way, it would nevertheless be difficult to sustain the Stamp Company's contention. The tax, of which the Stamp Company complains, was not imposed by a special act aimed at the trading-stamp business exclusively. On the other hand, the provision imposing it is a part of one section of a lengthy act dealing with some 23 different occupations and businesses. The act was itself a part of a series of measures which together apparently recast a large part, if not the entire, tax code of the state. They were all passed at a single special session of the state Legislature held in August, 1904. This revision of the taxing system of the state was seemingly the principal purpose of the Legislature coming together at all at that time. So far as form and manner go, the presumption that this was in truth and in fact intended as a taxing measure is strong. It is true that of the other 23 occupations dealt with, some, such as the business of dealing in intoxicating liquors, may be lawfully prohibited altogether because of the dangers to which it is supposed that they may subject public morality and order; others, such as that of hawkers and peddlers, may require regulation and restriction. That of stock and merchandise brokers would not ordinarily be classed in such a category. Their business would appear to be as legitimate and at least as necessary as that of vendors of trading stamps. This same act imposes the franchise taxes which are levied on corporations doing business in the state. There can be no question that this last-named provision is a revenue measure pure and simple.

The bill states that this act had been on the statute books of West Virginia for more than three years before the Stamp Company first sought to do business in the state. It is a foreign corporation. The business which it undertook to do was purely intrastate. The state had the right to say that it should not do business in West Virginia at all. It could have said so without assigning any reason for so saying, nor would the motive which led the Legislature so to say have been material. Security Mutual Life Ins. Co. v. Prewitt, 202 U. S. 246, 26 Sup. Ct. 619, 50 L. Ed. 1013, 6 Ann. Cas. 317.

According to the contention of the Stamp Company, the Legislature by imposing the license tax intended to prohibit the trading stamp business in West Virginia. If that business is one which the Legislature

may not prohibit generally, such an act of Assembly avowedly passed as a prohibitory measure would be invalid as against citizens of the state. It would be equally invalid as regards citizens of other states to whom the Constitution of the United States secures the rights, privileges, and immunities of citizens of the several states. Would the same principle apply in favor of corporations? Could not the Legislature say it would not permit any corporation, foreign or domestic, to engage in a particular kind of business, however legitimate that business might be? If such prohibition did not in any way directly restrain, limit, or attempt to regulate interstate commerce, might it not be perfectly valid? A corporation already engaged in the business in the state might possibly under some circumstances be able to claim protection against what would amount to a deprivation of its property, but in the face of such legislation could a foreign corporation come into the state and seek for the first time to engage in a business forbidden by the policy of the state as expressed by its Legislature? Would the fact that the legislation in question attempted to subject individuals to the same restraint and as against them was unconstitutional be any reason why it might not be applied to corporations? It is not necessary to answer these questions. It is sufficient to point out how many and how doubtful are the inquiries which must be made before we could say that the Supreme Court of Appeals of West Virginia was in error, assuming for the purposes of the argument, and for those purposes only, that we would have a right to say so at all.

[3] But there is still another difficulty in the way of holding this tax invalid. Has this court, or any court, the right to say that a tax may not be levied because in the judgment of the court the amount is so large that it could not reasonably have been intended to produce revenue? The Legislature of Georgia imposed upon each immigrant agent, or employer or employé of such agent, doing business in that state, the sum of $500 for each county in which such business was conducted. As in the case at·bar, the tax complained of was one of many imposed on different occupations. The amount of the tax varied with the character of the occupation. The Supreme Court said:

"The general legislative purpose is plain, and the intention to prohibit this particular business cannot properly be imputed from the amount of tax payable by those embarked in it even if we were at liberty on this record to go into that subject." Williams v. Fears, 179 U. S. 275, 21 Sup. Ct. 130, 45 L. Ed. 186.

[4] Another Georgia statute levied a tax of $200 in each county upon all agents of packing houses doing business in the state. The Supreme Court said:

"What the·necessity is for such tax and upon what occupations it shall be imposed, as well as the amount of the imposition, are exclusively within the control of the state Legislature. So long as there is no discrimination against citizens of other states, the amount and necessity of the tax are not open to criticism here." Kehrer v. Stewart, 197 U. S. 60, 25 Sup. Ct. 403, 49 L. Ed. 663.

In Postal Telegraph Co. v. Charleston, 153 U. S. 699, 14 Sup. Ct. 1097, 38 L. Ed. 671, a license fee of $500 was exacted of the com plainant by the city of Charleston, S. C. The company said that, if li-

cense exactions were allowed to and made by the various cities in the state, great injury and wrong would be done to the telegraph company. The Supreme Court said:

"This is a hardship, if such exists, that is not within our province to redress. If business done wholly within the state is within the taxing power of the state, the courts of the United States cannot review or correct the action of the state in the exercise of that power."

A still more thorough examination of the philosophy of the whole question was made by the Supreme Court of the United States in McCray v. United States, 195 U. S. 27, 24 Sup. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561. There the validity of the 10 cents a pound tax on colored oleomargarine was assailed. It was said there, as it is said here, that the purpose of the measure was not to raise revenue, but to prohibit the manufacture and sale of oleomargarine. The article, the dealing in which was said to be prohibited, was one which the states had a perfect right to permit to be sold. In that case it was held that Congress had the right to levy excise taxes, just as here it must be held that West Virginia had the right to levy occupation taxes. The court said:

"It is, however, argued if a lawful power may be exerted for an unlawful purpose, and thus by abusing the power, it may be made to accomplish a result not intended by the Constitution, all limitations of power must disappear, and the grave function lodged in the judiciary, to confine all the departments within the authority conferred by the Constitution, will be of no avail. This, when reduced to its last analysis, comes to this: That, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our constitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department."

The court went on to say:

"It is, of course, true, as suggested, that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power."

The court cited with approval Austin v. Aldermen, 7 Wall, 694, 19 L. Ed. 224, to the effect that:

"The right of taxation, where it exists, is necessarily unlimited in its nature. It carries with it inherently the power to embarrass and destroy."

The Constitution of the United States effectively prevents many forms of injustice, even when perpetrated under the guise of legislative acts. It does not prevent all of them. It cannot, without substituting the judicial for the legislative judgment and discretion in some matters in which the public weal requires that the legislative, rather than the judicial, decision shall be conclusive.

All that has been said has been said upon the supposition that the

trading stamp business is one which is so legitimate that the Legislature may not interfere with it, and may not prohibit it or unnecessarily hamper it. There are many decisions which hold that it is as legitimate a business as any other and may not be subject to restraints, prohibitions, and restrictions which might not lawfully be placed upon any of the ordinary occupations of mankind. Not all the cases go to this extent. The great majority of them do. There are very many of them in very many different states. Indeed, there are so many of them as to show that there is a difference of opinion between the courts and the Legislatures as to whether the trading stamp business is a business which does not in the public interest require regulation or prohibition. A large number of legislative bodies apparently have thought that it was; the courts that it was not. Whether the fact that so many Legislatures have held that it ought to be restrained raises a presumption that there is a real difference between it and many other occupations is a question which we need not here consider.

Assuming, but not deciding, that the Legislature has no power to prohibit such a business, it still follows from what has been heretofore said that the decree of the court below sustaining the demurrer and dismissing the bill was right, and must be affirmed.